**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | **No. 20-309** |
| **STEVEN J. VALENTINO, et al.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                                                  **January 23, 2023**

A grand jury indicted Steven J. Valentino for conspiracy to pay and receive healthcare kickbacks in violation of 18 U.S.C. § 371 and two counts of receiving healthcare kickbacks, or aiding and abetting the receipt of healthcare kickbacks, in violation of 42 U.S.C. § 1320(a)-7b(b)(1) and 18 U.S.C. § 2. The Indictment alleged Valentino, his office manager, two medical device salesmen, and a Texas pharmacy owner conspired to pay and receive, and paid and received, kickbacks in exchange for Valentino's compound pain cream prescriptions for four years. A jury convicted Valentino of all counts on September 21, 2022 following a nine-day trial. (ECF 228.) Valentino now timely moves for judgment of acquittal or a new trial under Federal Rules of Criminal Procedure 29 and 33. For the reasons set forth below, the Court denies Valentino's motion.

## I.    BACKGROUND

### A. The Conspirators

#### *Steven Valentino*

Steven Valentino is a board-certified orthopedic spine surgeon. (ECF 206, Notes of Testimony (N.T.), 195:19-196:4.) He owned and operated Valentino Spine and Orthopedics (which later became Liberty Spine) with two locations, one in Pennsylvania and one in New Jersey.

(ECF 236, N.T., 182:17-183:8; ECF 238, N.T., 105:11-15.) Valentino treated patients with neck and spine injuries, some of whom were insured by Medicare and the Department of Labor, Office of Workers Compensation programs. (*See* Ex. 226, 227, 228, 229, 230, 231, 262, 404, 404A, 405, 405A, 406, 406A, 408, 408A, 412A, 413A; ECF 206, N.T., 116:9-148:11, 149:1-176:7; ECF 236, N.T., 161:14-180:25; ECF 237, N.T., 11:15-36:22.) Valentino participated in both federally-funded insurance programs. (Ex. 101, 102, 103, 114, 116, 117, 118, 622, 624; ECF 206, N.T., 26:25-27:3, 36:15-44:5, 179:16-24, 181:13-182:7, 183:15-185:25, 187:18-25.)

### *James Jackson and Ian Douglas*

James Jackson and Ian Douglas[1] owned and operated NewTech Medical which Jackson started in 2011. (ECF 235, N.T., 178:8-16; ECF 236, N.T., 28:12-14; ECF 237, N.T., 42:22-43:7, 122:6-12.) NewTech is a medical device distributorship which Jackson still operates today. (ECF 235, N.T., 178:2-7; ECF 237, N.T., 38:16-17, 117:1-4, 118:6-8.) It sells "spinal fusion implants to spine doctors, orthopedic surgeons, and neurosurgeons." (ECF 237, N.T., 42:22-43:3.) Jackson and Douglas also owned Capital Diagnostics. (ECF 235, N.T., 178:24-179:4; ECF 236, N.T., 13:13-14:9; ECF 237, N.T., 43:8-15.) Capital Diagnostics was "a liaison or a bit of a distributor, [to] process urine drug samples." (ECF 235, N.T., 209:20-210:4.) Although NewTech and Capital Diagnostics were separate business entities, Jackson and Douglas transferred money back and forth between the entities "as [they] felt needed." (ECF 236, N.T., 27:22-28:15; ECF 238, N.T. 76:12-77:17.)

---

[1]     The United States charged Jackson and Douglas separately by Information for their conduct in this scheme. *See United States v. Jackson*, No. 20-191; *United States v. Douglas*, No. 20-190. They pleaded guilty to conspiracy to pay and receive healthcare kickbacks and testified under a cooperation agreement with the United States. Ex. 608, 610.

Valentino worked with Jackson and Douglas both within and outside of the illicit kickback scheme at the center of this case and described below. For example, from 2013 to 2017, Jackson and Douglas attended Valentino's surgeries to assist with bone marrow aspirate procedures. (ECF 236, N.T., 126:25-128:21.) Either Jackson or Douglas operated a centrifuge to extract the bone marrow from the patient's blood which Valentino then injected back into the patient to promote faster healing. (*Id.* at 126:25-128:21; ECF 237, N.T., 177:2-21, 184:22-185:4, 188:6-14.) Douglas attended the vast majority of the eighty or so procedures when Valentino used the bone marrow aspirate from 2013 to 2017. (ECF 236, N.T., 129:15-19.) Valentino assisted NewTech in getting the bone marrow aspirate product approved for use in Kennedy Memorial Hospital, Bryn Mawr Hospital, and Mercy Suburban Hospital. (*Id.* at 131:14-17; ECF 237, N.T., 184:1-9, 192:22-193:13.) Valentino also knew Jackson personally, as their children went to school together, and Jackson, Jackson's wife, Valentino, and Valentino's wife had dinner together socially at least once. (Ex. Miller 116; ECF 237, N.T., 45:15-19, 169:5-170:6, 210:5-18.)

### Michele Miller[2]

Co-defendant Michele Miller was Valentino's office manager. (ECF 237, N.T., 211:12-14.) Prior to joining Valentino, Miller had extensive experience in healthcare administration. (ECF 236, N.T., 22:6-23:9, 25:5-15, 36:16-20.) Miller participated in the kickback scheme at the center of this case described below, and she worked with Jackson and Douglas outside of her roles as Valentino's office manager and in this illicit kickback scheme.[3] (ECF 235, N.T., 60:16-20.)

---

[2]  Although Miller moved under Rule 29 for judgment of acquittal on counts six and seven of the Indictment at trial, she is not a movant in the instant motion. (ECF 240, Tr., 5:15-7:5.)

[3]  Jackson approached Miller in 2012 or 2013 to work as a consultant for his and Douglas's businesses. (ECF 236, N.T., 21:13-22:5; ECF 237, N.T., 211:3-7.) Miller contracted with Capital Diagnostics in 2013 as a consultant to develop business opportunities. (Ex. 710; ECF 235, 173:12-

3

23, 173:24-174:3, 210:16-22.) The agreement, dated March 29, 2013, was between Miller Healthcare Consulting LLC and Capital Diagnostics LLC. (Ex. 710; ECF 235, N.T., 213:9-15; ECF 236, N.T., 27:3-6.) Jackson and Douglas prepared the contract for Miller by "cut[ting] and past[ing]" the terms of a contract NewTech had with another entity into the contract with Miller. (ECF 236, N.T., 28:23-29:8; ECF 237, N.T., 219:9-22.) The agreement defined Miller's expected consulting services. (Ex. 710; ECF 235, N.T., 213:16-23; ECF 236, N.T., 29:9-30:2; ECF 237, N.T., 219:25-220:14.) Miller was to be paid $500 per hour with a minimum of three-hours per month for a one-year term (*i.e.* March 2013 to March 2014). (Ex. 710; ECF 237, N.T., 222:13-15.) Miller and Capital Diagnostics never executed another agreement after March 29, 2013. (Ex. 710; ECF 235, N.T., 232:17-233:22; ECF 236, N.T., 140:13-141:10; ECF 238, N.T., 75:16-76:7.)

Consistent with her consulting agreement, Miller completed "checklist[s]" for the services she provided and faxed them to Douglas at Capital Diagnostics who then forwarded them to Jackson. (Ex. 710A, 713; ECF 235, N.T., 215:6-218:24; ECF 236, N.T., 31:15-23.) At times, the checklist submitted included "MedX Pharmacy" on them as services Miller provided under the agreement. (Ex. 713; ECF 235, N.T., 215:6-218:24.) Ultimately, Jackson and Douglas paid Miller for legitimate consulting services for only "the first few months" of the consulting agreement's term. (ECF 235, N.T., 212:19-214:21; ECF 236, N.T., 31:24-32:8.) But Jackson and Douglas called upon her well after that for assistance with various topics, including insurance reimbursements and denials, pre-authorization and pre-certification issues, various billing forms and codes, collections. (Miller Ex. 45, 48, 59; ECF 235, N.T., 213:2-214:21; ECF 236, N.T., 31:24-32:3, 36:16-43:7, 43:25-47:9; ECF 238, N.T., 19:8-13, 30:1-32:7, 36:3-9, 37:21-38:22, 39:9-40:1, 41:1-18, 41:20-42:9, 46:22-47:21.)

In late 2015 or early 2016 (*i.e.*, after her consulting agreement had expired), Miller worked with Jackson and Douglas in getting another company—Checkpoint IME—off the ground. (ECF 235, N.T., 174:5-13; ECF 236, N.T., 47:10-49:25; ECF 238, N.T., 47:22-49:3.) Miller was a partner with Douglas and Jackson in Checkpoint IME. (ECF 236, N.T., 145:3-17; ECF 237, N.T., 198:17-22.) Her tasks included setting up and attending various meetings and phone calls between the Checkpoint IME team, preparing meeting minutes, arranging and attending dinners and lunches to promote Checkpoint IME, and creating promotional and marketing materials and IME consent forms. (Ex. Miller 5, 14, 18, 19, 19-2, 24, 25, 26, 31-34, 50, 62, 68, 69, 70; ECF 236, N.T., 49:16-61:21, 63:2-72:24; ECF 238, N.T., 49:13-51:1.) Valentino was also tangentially involved in Checkpoint IME, discussing it at times with Jackson. (ECF 236, N.T., 121:5-12, 124:2-12; ECF 237, N.T., 198:23-200:5, 201:14-203:10.) Checkpoint IME ultimately did not operate successfully and performed only one or two IMEs. (ECF 235, N.T., 174:5-13.)

4

### *Leah Afolabi*

Co-defendant Leah Afolabi,[4] Jackson's ex-sister-in-law, owned and operated MedX Pharmacy & Compounding in Pearland, Texas with her husband, Richard Afolabi. (ECF 206, N.T., 216:2-5, 225:1-3; ECF 235, N.T., 80:8-13.) They owned it from 2011 to 2019. (ECF 206, N.T., at 216:2-3.) MedX was a full-service, community pharmacy where patients brought their prescriptions to be filled or MedX filled and mailed the patient his or her prescription out-of-state. (*Id.* at 223:16-21; ECF 235, N.T., 96:3-11.) MedX filled prescriptions for "the same kind of medications as other retail pharmacies" as well as compound medications. (ECF 235, N.T., 96:12-97:10.) MedX participated in both Medicare and Department of Labor, Office of Workers Compensation insurance programs. (Ex. 620; ECF 206, N.T., 182:9-183:14, 218:7-15.)

### B. The Scheme to Pay for Prescriptions

Valentino, Jackson, Douglas, Miller, and Afolabi's worlds collided in a scheme—with Jackson at the "center of it all"—involving paying and receiving kickbacks in exchange for the referral of Valentino's patients' compound pain cream prescriptions to MedX. (ECF 237, N.T., 39:3-9; 150:3-5, 150:13-18, 151:18.)

### *Afolabi, Douglas, and Jackson agree to send referrals in exchange for payment.*

In late 2012, Afolabi and Jackson discussed a "lucrative and good" business opportunity for MedX to dispense compound pain creams. (ECF 206, N.T., 226:14-24; ECF 237, N.T., 153:24-155:4.) Compound pain creams are creams or ointments containing multiple ingredients created individually for the patient and applied topically for pain relief. (ECF 206, N.T., 33:3-17, 189:13-

---

[4]      Afolabi also pleaded guilty to conspiracy to pay and receive healthcare kickbacks and testified under a cooperation agreement with the United States. Ex. 613.

20.) Jackson informed Afolabi that these prescriptions were reimbursed at a "high level" due to their individualized nature and provided suggested formulations which insurance companies would possibly cover. (ECF 206, N.T., 226:14-24, 227:2-5.) MedX began filling compound pain cream prescriptions, and Afolabi confirmed these prescriptions were in fact reimbursed at the level Jackson suggested. (*Id.* at 227:2-6.) Jackson and Afolabi then discussed Jackson becoming a distributor or representative for MedX's compound pain creams through his company, NewTech, wherein he and Douglas would solicit doctors to send compound pain cream prescriptions to MedX and Afolabi would pay them a percentage of profit earned on each prescription.[5] (*Id.* at 227:2-12; ECF 237, N.T., 157:9-13.)

### *Miller and Valentino join.*

For the scheme to work, Jackson and Douglas needed physicians they worked with to send compound pain creams prescriptions to MedX. Jackson informed Afolabi he had a relationship with Valentino, who he described as a "big fish," and he connected Afolabi and Miller by phone. (ECF 206, N.T., 227:12-16; ECF 237, N.T., 45:10-19, 47:1-6, 156:2-157:3.) Afolabi also connected with Valerie Valentino, Valentino's wife who worked in his office, in December 2012. (Ex. 947; ECF 206, N.T., 236:8-238:9; ECF 241, N.T., 69:20-70:8.) Afolabi emailed Valerie on her Valentino Spine email address to discuss a possible relationship between MedX and Valentino. (Ex. 947, 951, 988; ECF 206, N.T., 236:8-238:9; ECF 241, N.T., 69:20-70:8.) They discussed various things, including the number of compound pain cream prescriptions Valerie anticipated

---

[5]     Jackson and Afolabi offered contradictory testimony about whether Jackson approached Afolabi about the compound pain creams or vice versa. Regardless, they both testified these discussions took place. Jackson also discussed being paid by MedX for the scripts with Afolabi's husband (an unindicted co-conspirator in this case) after his initial conversation with Afolabi. (ECF 237, N.T., 159:25-162:12; *see also* ECF 238, N.T., 60:4-9.)

Valentino sending to MedX, whether Valentino could send the scripts to an out-of-state pharmacy, and how the financial agreement between MedX and Valentino would work. (Ex. 947, 947A, 951, 988, 988A, 1001 1001A; *see also* ECF 206, N.T., 244:6-19; ECF 235, N.T., 111:11-114:19.) Afolabi also sent Valerie a Doctor Direct Distribution Agent Agreement, which was a template contract Jackson gave Afolabi to use with physicians. (ECF 947, 947A: *see also* ECF 206, N.T., 236:25-238:9.) The agreement was "a way to go into a financial relationship directly with the doctor's office." (ECF 206, N.T., 238:6-9.) Under the agreement, MedX would pay Valentino to provide promotional services for MedX's compound pain creams. (Ex. 947A; ECF 206, N.T., 239:6-12.) Ultimately, neither Valentino nor Valerie signed the agreement, and Valentino did not perform any promotional services or collect any money directly from MedX. (ECF 206, N.T., 238:22-239:25; *see also* Ex. 952.)

Nevertheless, the failure to consummate this written agreement did not end the prospects of a business relationship. Instead, Valentino, Jackson, Douglas, Miller, and Afolabi concocted and initiated the following scheme: (1) Valentino and Miller sent compound pain cream prescriptions to MedX for fulfillment; (2) MedX paid NewTech a portion of the profits generated from Valentino's prescriptions; and (3) NewTech then paid Valentino and Miller their share of the profits from the prescriptions. (ECF 206, N.T., 244:20-245:8, 249:18-25, 250:11-251:9; ECF 235, N.T., 34:11-16, 40:12-41:7, 45:1-11, 46:4-47:18, 48:9-50:18; 59:5-60:15, 170:18-171:20, 172:5-173:6, 179:9-19; 189:17-190:12; ECF 237, N.T., 44:11-23, 46:13-22; ECF 238, N.T., 74:11-25, 101:22-102:24, 132:5-8, 133:3-13, 155:2-19; *see also* Ex. 201A, 205A, 208, 903, 904, 906, 906A, 908, 908A, 908B, 914, 914A, 915, 915A.)

### *How the scheme operated.*

Valentino began sending prescriptions to MedX in early 2013, soon after Afolabi connected with Miller and Valerie Valentino. (ECF 206, N.T., 247:20-24; ECF 237, N.T., 47:1-21.) Miller announced to Valentino's office staff that Valentino decided to begin prescribing compound pain creams. (ECF 241, N.T., 62:23-63:12.) Valentino made the decision to send prescriptions to MedX each time they were prescribed, and it was Valentino's practice "for a time" to send compound pain cream prescriptions to MedX. (*Id.* at 59:1-23.)

After Valentino saw a patient, the patient stopped at the receptionist with his or her paperwork to check out. (ECF 236, N.T., 186:17-187:3, 187:11-13, 189:21-25; ECF 241, N.T., 58:1-25.) If Valentino prescribed the patient compound pain cream, the patient handed the receptionist the MedX compound pain cream prescription form[6] which Valentino filled out and signed.[7] (Ex. 704, 918, 988A; ECF 206, N.T., 233:13-235:25, 239:20-25; 256:14-20; ECF 235, N.T., 180:22-181:12; ECF 236, N.T., 186:3-9; ECF 241, N.T., 46:13-48:3, 61:22-62:15.) The patient also handed over an encounter form. (ECF 241, N.T., 58:19-25.) The encounter form noted which prescriptions Valentino prescribed, and, for the prescriptions Valentino wanted sent to MedX, he wrote "MedX" on the form. (*Id.* at 59:1-18.) After receiving the patient's paperwork, the receptionist printed the patient's demographic sheet, and someone faxed the prescription and demographics to MedX. (ECF 235, N.T., 29:11-14; ECF 236, N.T., 190:8-22; ECF 241, N.T., 49:11-15, 62:16-22.) This sequence played itself out again and again.

---

[6]     This form was different than the usual prescription pad Valentino used and was used specifically for scripts sent to MedX. (Ex. 704; ECF 236, N.T., 190:1-7; ECF 241, N.T., 61:22-24.)

[7]     In some instances, Valentino's medical assistant or Miller filled out the MedX prescription form for patients at Valentino's direction. (ECF 241, N.T., 61:22-62:12.)

While Miller was responsible for ensuring compound pain cream prescriptions were sent to MedX, various employees faxed them including the receptionist, the medical assistant, and Miller herself. (Ex. 233-34, 237, 239, 241-44, 246, 250, 253; ECF 206, N.T., 219:13-25; ECF 235, N.T., 29:15-30:16, 179:20-25; ECF 236, N.T., 190:23-24; ECF 241, N.T., 62:16-22.) Some prescriptions were electronically faxed to MedX. (ECF 235, N.T., 29:11-14.)

Once MedX received the patient's prescription, it billed their insurance company (including Medicare and Department of Labor, Office of Workers Compensation) to see if the insurer covered the cream. (Ex. 201, 226, 227, 228, 229, 230, 231, 261, 262; ECF 235, N.T., 101:17-20;[8] ECF 237, N.T., 48:20-49:1.) MedX billed the insurance company using the average wholesale price of the compound medication, which is an industrywide standard for drug pricing. (ECF 235, N.T., 101:22-102:17.) If insurance paid for the prescription, a pharmacist contacted the patient to ensure he or she wanted it. (*Id.* at 103:7-24.) If so, MedX then shipped the medications to Valentino's patients at their New Jersey or Pennsylvania homes.[9] At times, Valentino's staff contacted MedX to cancel the prescriptions if the patient no longer wanted the medication. (Ex. 925, 927.)

Throughout the scheme, Valentino prescribed compound pain creams to numerous patients who were insured by Medicare or the Department of Labor Office of Workers Compensation (some used and liked the medication and others did not), and MedX billed their insurance, filled the prescriptions, and mailed the creams to their homes. (*See* Ex. 226, 227, 228, 229, 230, 231,

---

[8]    The record indicates counsel for the United States answered this question. The record is incorrect. The witness, Leah Afolabi, answered the question posed.

[9]    MedX applied for licenses in Pennsylvania and New Jersey to ship prescriptions to Valentino's patients because of Valentino's referrals. (ECF 235, N.T., 160:20-161:14.)

262, 404, 404A, 405, 405A, 406, 406A, 408, 408A, 412A, 413A; ECF 206, N.T., 116:9-148:11,

149:1-176:7; ECF 236, N.T., 161:14-180:25; ECF 237, N.T., 11:15-36:22.)

### *The payments from MedX to NewTech and NewTech to Valentino and Miller.*

Payments from MedX to NewTech and NewTech to Valentino and Miller began in May

2013— precisely when Valentino began prescribing the creams and sending them to MedX for

fulfillment. (Ex. 201, 202, 203A, 204, 205A, 207A, 208, 210, 261; ECF 237, N.T., 54:3-57:11;

ECF 238, N.T., 132:5-8, 133:3-13, 155:2-19, 164:9-12.) MedX paid NewTech for Valentino's

prescriptions via checks[10] endorsed by Afolabi on a monthly basis.[11] (Ex. 205A, 215; ECF 235,

N.T., 57:7-12; 58:15-59:4; 201:15-25; ECF 237, N.T., 49:3-13, 72:4-18.). The check amounts

fluctuated each month because the payments depended on the volume of prescriptions Valentino

sent to MedX and the amount reimbursed by insurance for each prescription. (Ex. 205A; ECF 237,

N.T., 52:11-53:3.) MedX never paid Valentino or Valentino Spine directly for the prescriptions,

only NewTech. (ECF 235, N.T., 115:25-116:3.)

Once NewTech received the checks from MedX, Jackson deposited them into NewTech's

Citizens Bank account, and, within days, Jackson wrote checks to Valentino, Miller, and Douglas

which were deposited in their respective accounts.[12] (Ex. 205A, 208, 514C, 514D, 514E, 514N,

---

[10]    MedX's checks were drawn on a Wells Fargo bank account and made out to NewTech. (ECF 235, N.T., 57:13-18.)

[11]    Valentino was not the only doctor Jackson and Douglas approached to send the compound pain cream prescriptions to MedX. But Valentino prescribed the majority of prescriptions for which MedX paid NewTech, and the majority of the money MedX paid to NewTech was for Valentino's prescriptions. (Ex. 222, 223, 224; ECF 235, N.T., 54:11-13; ECF 237, N.T., 63:8-24.) NewTech did not pay the other physicians for the prescriptions they sent to MedX, and "upwards of 95%" of the money MedX paid to NewTech was for Valentino's prescriptions. (ECF 237, N.T., 63:8-24.)

[12]    Jackson mailed Valentino's checks to his King of Prussia, Pennsylvania office and Miller's

514S; ECF 235, N.T., 202:1-6; ECF 236, N.T., 79:18-80:10; ECF 237, N.T., 49:14-25, 51:1-52:10, 53:8-54:2; ECF 239, N.T., 102:1-103:4.) NewTech kept approximately half the amount MedX paid for Valentino's scripts and the other half went to Valentino and Miller.[13] (ECF 235, N.T., 202:7-24; ECF 237, N.T., 49:14-25.) Jackson and Douglas split NewTech's share of the money 50/50. (ECF 235, N.T., 202:25-203:2; ECF 237, N.T., 49:14-25.) Although the memo lines on the checks from NewTech to Valentino and Miller would at times say "advisory" or "advisory services" to make them "look legitimate," all checks from NewTech to Valentino and Miller were for their portion of profits for Valentino's prescriptions sent to MedX. (Ex. 208, 514N, 514S; ECF 235, N.T., 205:5-24; ECF 236, N.T., 151:12-152:12, 153:6-25; ECF 237, N.T., 61:20-63:7, 68:11-25, 69:1-8, 70:13-72:2, 72:19-73:20, 76:15-77:16, 78:2-20, 79:12-80:17.)

While the basics of the scheme stayed the same over the four-year period, the way money flowed evolved over time. For example, at first, Jackson only paid Valentino Spine for the referrals.[14] (Ex. 204, 208; ECF 237, N.T., 54:1-55:2.) But Jackson "want[ed] [Miller] to win as well" so he began sending Miller a separate check made out to Miller Healthcare for 10% of the profit share he paid to Valentino Spine. (Ex. 204, 208; ECF 237, N.T., 54:21-57:18.) Jackson also began sending two checks to Valentino, one for Valentino and one for his office staff who were

checks to her house. (ECF 237, N.T., 59:11-22, 90:1-25.)

[13]     The money paid directly to Miller Healthcare was deducted from Douglas and Jackson's share of the profit split because they did not want Valentino's portion of the profit split to become less. (ECF 237, N.T., 57:19-59:10.) The same is true for the money paid to Valentino's staff. (ECF 237, N.T., 61:7-11.)

[14]     During the scheme, Miller's pay from Valentino Spine included a "bonus" from the "MedX money" received by Valentino Spine from NewTech. (Ex. 910, 930, 932, 967, 968, 969, 970, 973, 974, 975, 976, 977, 978, 979, 980, 981, 982, 983, 985, 986, 987; ECF 238, N.T., 165:13-172:25, 174:3-6, 174:14-178:25, 180:19-189:2, 193:5-11.)

"working hard" to get prescriptions to MedX. (Ex. 204, 208; ECF 237, N.T., 59:23-61:9.) Like Miller, Valentino's staff got 10% of the profit share he received. (Ex. 204, 208; ECF 237, N.T., 60:24-61:6.)

Additionally, in late 2014 or early 2015, Afolabi realized the way she paid NewTech was illegal. (ECF 235, N.T., 61:8-62:2.) She suggested to Jackson and Douglas they should become MedX employees and be paid as W2 employees, rather than only receiving checks for a percentage of profits for each referral. (*Id.* at 61:22-62:2, 174:23-175:6.) Afolabi put Jackson and Douglas on MedX's payroll in February 2015, but she continued to pay them roughly the same amount of money—*i.e.*, a percentage of the profit from Valentino's prescriptions. (Ex. 521A, 521B, 514A, 514B; ECF 235, N.T., 61:22-63:4, 64:9-11, 219:18-221:9, 221:12-222:10, 222:13-223:25, 224:5-226:3; ECF 237, N.T., 49:3-13, 65:1-25.) The payroll amounts did not cover Jackson and Douglas's portion of the profits to be shared, however; so, in addition to paying Jackson and Douglas on payroll, Afolabi continued to pay NewTech via check to make up the difference. (ECF 235, N.T., 62:21-63:4, 63:7-65:13, 165:4-6, 220:21-221:9, 222:13-223:25, 224:5-226:3; ECF 237, N.T., 65:1-25; *see also* Ex. 514A, 514B, 521A, 521B.) And even though Jackson and Douglas were on payroll, they did not perform any actual work for MedX. (ECF 235, N.T., 164:12-17.) Jackson and Douglas, through NewTech, just continued to facilitate referrals to MedX, and Afolabi kept them on payroll to conceal the true nature of the payment-for-referrals scheme. (*Id.* at 164:18-165:6, 219:24-220:1.)

### *Examples of payments from MedX to NewTech and NewTech to Valentino and Miller during the scheme.*

For example, on June 14, 2014, MedX paid NewTech through three checks Afolabi signed: one for $21,949, one for $18,000, and one for $13,316. (Ex. 514C; ECF 237, N.T., 66:1-67:1.)

Three days later, NewTech paid Valentino, Miller, and Douglas. (Ex. 514D, 514E; ECF 237, N.T., 67:4-69:16.) Jackson, through NewTech, wrote a check for $21,200 to Valentino Spine, $2,100 to Valentino Spine for Valentino's staff, $2,100 to Miller Healthcare, and $8,480 to Douglas. (Ex. 514D, 514E; ECF 237, N.T., 67:4-69:16, 76:7-10.)

On July 21 and 22, 2014, MedX paid NewTech through four checks Afolabi signed: one for $17,200, one for $17,400, and two for $18,000. (Ex. 514F; ECF 237, N.T., 69:18-70:11.) On July 23, 2014, Jackson, through NewTech, wrote four checks: two to Valentino Spine—one for $21,700 and one for $2,170; one to Miller Healthcare for $2,170; and one to Ian Douglas for $4,140. (Ex. 514G; ECF 237, N.T, 70:13-72:2, 76:7-10.)

On January 15, 2015, MedX paid NewTech $45,600 through three checks Afolabi signed. (Ex. 514H; ECF 237, N.T., 72:4-18.) Jackson, through NewTech, then wrote Valentino two checks, one for $16,300 and one for $1,630, and Miller one check for $1,630—all dated January 20, 2015. (ECF 514I, 514J; ECF 237, N.T., 72:19-20, 76:7-10.)

On January 19, 2016, MedX paid NewTech $19,800 by check Afolabi signed in addition to payroll payments paid to Douglas and Jackson. (Ex. 205A, 514K; ECF 237, N.T., 75:19-76:3.) On January 28, 2016, Jackson, through NewTech, then wrote four checks: one to Douglas for $6,6612.50; one to Miller Healthcare for $3,500; and two to Valentino Spine—one for $6,000 and one for $600. (Ex. 514L; ECF 237, N.T., 76:7-10, 76:15-77:16; *see also* Ex. 211, 212, 213, 214; ECF 239, N.T., 111:20-113:17.)

On July 19, 2016, MedX paid NewTech $20,000 at Afolabi's direction. (Ex. 514M; *see also* Ex. 216; ECF 239, N.T., 114:1-15.) On July 25, 2016, Jackson, through NewTech, then wrote three checks: one to Miller Healthcare for $3,300; and two to Valentino Spine—one for $3,350

13

and one for $350. (Ex. 514N; ECF 235, N.T., 203:17-204:7; ECF 237, N.T., 76:7-10, 78:2-20; *see also* Ex. 217, 218, 219; ECF 239, N.T., 114:16-115:15.)

On August 19, 2016, MedX paid NewTech $17,800 by check Afolabi signed. (Ex. 514O; ECF 237, N.T., 79:3-10.) On August 31, 2016, Jackson, through NewTech, wrote a check to Valentino Spine for $4,000. (Ex. 514P; ECF 237, N.T., 79:11-80:17.) One day later, he wrote checks to Valentino Spine ($400), Miller Healthcare ($3,500), and Douglas ($4,950). (Ex. 514P; ECF 237, N.T., 79:12-81:6; *see also* Ex. 220; ECF 239, N.T., 115:16-116:3.)

These examples are "a fraction" of the checks (and payroll payments) exchanged from 2013 to 2017.[15] (ECF 237, N.T., 81:7-19; *see also* Ex. 205A, 208.) This pattern of checks from MedX to NewTech, and NewTech (or in some instances, Capital Diagnostics who at times paid Miller her share of the kickbacks) to Valentino and Miller continued from May 2013 to April 2017, the same time period during which Valentino sent prescriptions to MedX for fulfillment. (Ex. 202, 205A, 208; *see also* Ex. 502A, 502B; ECF 235, N.T., 210:23-212:13, 214:11-21; ECF 236, N.T., 149:9-152:24; ECF 237, N.T., 81:14-19; ECF 238, N.T., 132:5-8, 133:3-13, 155:2-19.)

### *Afolabi, Douglas, Jackson, Valentino, and Miller keep the scheme going and track their earnings.*

To keep the scheme going, Miller and Afolabi spoke about once a month, including about the prescriptions, payments, and personal matters such as their families. (ECF 206, N.T., 218:25-219:11; ECF 235, N.T, 52:11-18, 81:21-84:15.) Miller was Afolabi's "direct line of

---

[15]     Douglas also received a $4,950 check from NewTech dated March 28, 2016, a portion of which was for his portion of the profits for Valentino's prescriptions sent to MedX. (Ex. 514Q; ECF 235, N.T., 207:23-209:9.) He received a $1,000 check from NewTech dated December 2, 2016 for his portion of the MedX profits. (Ex. 514S; ECF 235, N.T., 206:2-207:2.) The same thing occurred in June 2017—this time, though, the check from NewTech was for only $303. (Ex. 514T; ECF 235, N.T., 207:3-22.)

communication" between MedX and Valentino's office and "the person to reach out to and [to] correspond [with] about the prescriptions." (ECF 206, N.T., 227:22-228:4.)

Jackson and Miller also spoke about the status of NewTech's payments to Valentino and Miller. (Ex. 928, 934, 936, 941; ECF 237, N.T., 82:15-85:10, 86:22-91:13.) Indeed, Miller knew the money paid to her and Valentino from NewTech was tied to money MedX paid NewTech. She emailed Jackson in the middle of the scheme asking: "Did mail from Leah [Afolabi] go out yet" because there was "nothing in the mail at office from weekend." (Ex. 936; ECF 237, N.T., 87:10-89:10.) Jackson responded he "ha[d] the mail. Got it on Friday. Sending out today." (Ex. 936.) Miller also sent Jackson tallies of the prescriptions Valentino wrote and sent to MedX. (Ex. 935, 938; ECF 237, N.T., 101:5-105:1.)

Miller similarly tracked Valentino Spine's total revenue received from NewTech and sent the information via spreadsheet to Valentino and his wife.[16] (Ex. 909, 909A, 972, 972A, 1004, 1004A, 1005, 1005A; 1006, 1006A, 1007A, 1007A, 1008, 1008A, 1009, 1009A, 1010, 1010A, 1011, 1011A, 1013; ECF 238, N.T., 143:7-154:7.)

Jackson and Afolabi also communicated at least monthly about the scheme. Each month, Afolabi sent Jackson a spreadsheet showing the profit for each script referred from NewTech to MedX as well as the "commission" NewTech earned for each prescription, which Jackson in turn forwarded along to Douglas. (ECF 235, N.T., 50:19-22, 191:7-192:15, 192:18-198:17; 198:20-201:14; ECF 237, N.T., 98:20-101:4; *see also* Ex. 902, 902A, 906, 906A, 914, 914A, 915, 915A.)[17]

---

[16]    Valentino's accountant asked Valentino Spine to create and maintain these spreadsheets and send them to him quarterly to assist with banking reconciliation and Valentino's corporate and individual tax returns. (ECF 239, N.T., 184:24-187:13, 194:1-195:6.)

[17]    MedX used PioneerRX software to generate the reports indicating all prescriptions sent from Valentino, including the prescription number, patient name, prescriber, what was prescribed,

At times, the spreadsheet was broken down to include only the scripts Valentino sent to MedX. (ECF 235, N.T., 46:2-17, 50:10-18; Ex. 914, 914A, 915, 915A.)

Afolabi, Douglas, and Jackson never spoke directly to Valentino about MedX. (ECF 235, N.T., 123:18:25; ECF 236, N.T., 79:7-9, 79:13-17; ECF 237, N.T., 116:9-11.)

### *The scheme fizzles out after insurance stops reimbursing for pain creams.*

The once-lucrative illicit kickback scheme eventually fizzled out and ended in 2017. By 2015 or 2016, insurance started denying reimbursement for compound pain creams. (Ex. 210, 1003; ECF 235, N.T., 31:4-20, 218:25-219:11; ECF 237, N.T., 105:2-13.) As a result, in February 2015, Afolabi sent Miller and Jackson an email attaching a letter for Valentino to sign which would permit MedX to substitute a covered, commercial pain cream when insurance denied reimbursement for the prescribed compound pain cream. (Ex. 1003; ECF 235, N.T., 34:19-36:23.) Valentino signed the letter, allowing the scheme to continue a little longer. (Ex. 943, 1003; ECF 235, N.T., 34:19-36:23; ECF 237, N.T., 105:14-107:10; ECF 241, N.T., 66:9-67:7.) Miller, Afolabi, and Jackson nevertheless attempted to find ways to get the higher-reimbursed compound pain creams covered. (Ex. 940, 942.) After all, the more money earned on each prescription, the more money each conspirator pocketed.

The scheme came to a halt in 2017 when insurance stopped reimbursing for pain creams (both compound and commercial) altogether leaving minimal profits to share amongst the conspirators (profits which at one time were "off the charts"); Valentino stopped prescribing and sending the prescriptions to MedX for fulfillment; MedX stopped paying NewTech for Valentino's

---

what was dispensed, who paid (*i.e.* which insurance company or whether it was paid some other way), and the gross profit for each prescription. (Ex. 701, 702; ECF 235, N.T., 54:14-57:6.)

referrals; and NewTech stopped paying Valentino and Miller for the prescriptions. (Ex. 205A, 207A, 208, 210, 908, 908A; ECF 235, N.T., 65:14-66:4, 67:3-70:5, 70:9-12, 140:19-141:2, 226:23-227:12, 232:7-14; ECF 237, N.T., 105:2-13, 107:11-108:12; ECF 238, N.T., 80:20-81:24, 155:2-19.)

### *The Business Advisor Agreement.*

Valentino contends NewTech paid him for consulting work performed under a Business Advisor Agreement and not for the compound pain cream prescriptions sent to MedX.

NewTech proposed a Business Advisor Agreement to Valentino in early 2013 (around the same time Valentino began sending prescriptions to MedX) wherein Valentino would act as a consultant and perform a variety of tasks outlined in the contract. (Ex. 709; ECF 235, N.T., 181:13-184:14; ECF 237, N.T., 91:22-96:18, 171:3-6, 190:1-24.) Jackson wanted Valentino's "knowledge and expertise to help NewTech learn about the market" and "[t]he mindset of other surgeons" in order to market the products he sold to other spine surgeons. (ECF 237, N.T., 172:11-22.)

The agreement, dated April 14, 2013, expired after one year. (Ex. 709; ECF 237, N.T., 92:3-6, 93:13-24.) Although Valentino signed the Business Advisor Agreement, neither he nor the United States introduced into evidence a copy of the agreement that was also signed by Jackson. (Ex. 709; ECF 235, N.T., 184:15-185:6; ECF 237, N.T., 92:1-18, 193:21-196:5). Jackson equivocated about the existence of a fully executed contract, first testifying he never signed the agreement, then saying he signed it but the signed version got lost, and finally that he could not remember if he signed it. (ECF 237, N.T., 92:1-18, 193:21-196:5; ECF 238, N.T., 69:13-70:2.)

Notably, though, Valentino did not perform any of the tasks listed in the agreement, and he did not submit any timesheets appended to the contract as Exhibit A. (Ex. 709; ECF 235, N.T., 181:13-184:14, 188:22-189:16; ECF 237, N.T., 94:16-95:1; *but see* ECF 237, N.T., 92:19-93:10.)

While Valentino provided NewTech with information about product positioning, customer mindset, and other relevant industry information for about two months, NewTech and Valentino never formalized a contractual consulting relationship.[18] (ECF 237, N.T., 173:20-24, 175:4-8, 175:22-176:1, 180:13-25, 181:16-20, 196:2-197:8.)

NewTech and Valentino did not renew the original unsigned agreement or sign any similar agreements in 2014, 2015, 2016, or 2017. (ECF 237, N.T., 93:25-94:15; ECF 238, N.T., 70:19-71:9.) Moreover, NewTech never paid Valentino for services rendered pursuant to the unsigned agreement. (ECF 237, N.T., 95:2-10.) The agreement was a "sham" to conceal the true nature of NewTech payments to Valentino. (ECF 237, N.T., 92:1-96:18; ECF 238, N.T., 74:11-14.)

## II.   LEGAL STANDARD

Valentino moves for judgment of acquittal under Federal Rule of Criminal Procedure 29, or alternatively, for a new trial under Federal Rule of Criminal Procedure 33. Valentino advances two overarching arguments: his conviction is not supported by "substantial evidence" and, alternatively, various purported errors (individually and collectively) warrant a new trial.

Rule 29 provides: "[a]fter the government closes its evidence or after the close of all the evidence, the court on defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Salahuddin*, 765 F.3d 329, 348 (3d Cir. 2014) (citing *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009)); *see also United States v. Alleyne*, 772 F. App'x 21, 23-24 (3d Cir. 2019). A jury's verdict is upheld if it passes the "bare rationality" test. *United States v. Caraballo-*

---

[18]    Jackson testified Valentino provided this information through discussions they had in the operating room. (ECF 237, N.T., 183:5-7.)

*Rodriguez*, 726 F.3d 418, 432-33 (3d Cir. 2013) (en banc); *see also United States v. Tyler*, 956 F.3d 116, 122-23 (3d Cir. 2020) (citing *Caraballo-Rodriguez*, 726 F.3d at 432). In reviewing a Rule 29 motion for judgment of acquittal, the Court must "view the evidence 'in the light most favorable to the prosecution' to determine whether a 'rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'" *Tyler*, 956 F.3d at 122 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (alteration in original); *see also Caraballo-Rodriguez*, 726 F.3d at 430. In so reviewing, the Court is "'highly deferential' to the factual findings of the jury," and it "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [the Court's] judgment for the jury." *Tyler*, 956 F.3d at 122 (quoting *Caraballo-Rodriguez*, 726 F.3d at 430). The Court "review[s] the evidence as a whole, not in isolation, and ask[s] whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt." *Caraballo-Rodriguez*, 726 F.3d at 430 (further citation and internal quotations omitted). The Court must "sustain the jury's verdict 'if there is substantial evidence, viewed in light most favorable to the government, to uphold the jury's decision.'" *Id.* (citing *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003)).

Rule 33 permits the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Salahuddin*, 765 F.3d at 346 (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)) (internal quotations and further citations omitted). In reviewing a Rule 33 motion, the Court does not "view the evidence favorably to the Government" and "instead exercises its own judgment in assessing the Government's case." *Id.* (quoting *Johnson*, 302 F.3d at 150) (internal

quotations omitted). Rule 33 motions "based on the weight of the evidence are not favored" and should be granted "sparingly and only in exceptional cases." *Id.* (quoting *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003)) (internal quotations and further citations omitted).

Rule 33 motions may also be based on errors or combination of errors made during the trial. A court may grant a new trial based on an error, or errors, only if the error(s) "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Greenspan*, 923 F.3d 138, 154 (3d Cir. 2019) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)) (internal quotations and further citation omitted); *see also United States v. Fratus*, No. 20-270, 2021 WL 6125132, at *2 (E.D. Pa. Dec. 28, 2021) (citing *Greenspan*, 923 F.3d at 154); *United States v. MacInnes*, 23 F. Supp. 3d 536, 541 (E.D. Pa. 2014), *aff'd sub nom. United States v. Keszey*, 643 F. App'x 153 (3d Cir. 2016). "Harmless errors that do not deprive a defendant of a fair trial provide no basis for granting a defendant's Rule 33 motion." *MacInnes*, 23 F. Supp. 3d at 541 (citing *Thornton*, 1 F.3d at 156). And cumulative errors do not warrant reversal "where the remaining evidence of guilt [is] 'overwhelming.'" *Greenspan*, 923 F.3d at 154 (citing *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994)).

## III.   DISCUSSION

Valentino moves under Rule 29 arguing the jury's guilty verdict against him is not supported by "substantial evidence" because there is no evidence he: (1) agreed to join the conspiracy; or (2) acted with the requisite intent to commit the crimes of conspiracy to pay and receive kickbacks or receiving healthcare kickbacks. He similarly moves under Rule 33 arguing the Court should grant a new trial in the interest of justice because there is no "credible testimony or supporting admissible evidence" he: (1) agreed to participate or was a member of the conspiracy; or (2) acted with the requisite intent to commit the crimes. He also argues the errors

made during trial, both individually and collectively, warrant a new trial under Rule 33. Understanding and applying Rule 29 and 33's different standards, the Court first analyzes Valentino's argument there is insufficient evidence to support the guilty verdict and then reviews his argument the Court's errors warrant a new trial.[19] The Court denies his motion because the trial evidence supported his conviction and there were no errors (either alone or together) sufficient to undermine it.

### A.     Elements of Charged Crimes

The jury convicted Valentino of conspiracy to pay and receive approximately $113,000 in healthcare kickbacks and two counts of receiving, or aiding and abetting the receipt, of healthcare kickbacks. (ECF 228.) To establish a violation of the Anti-Kickback Statute, the United States must prove beyond a reasonable doubt Valentino (1) "knowingly and willfully" (2) "solicit[ed] or receive[d] any remuneration (including any kickback, bribe, or rebate)" (3) "in return for referring an individual to a person for the furnishing … of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(1)(A); *see also United States v. Goldman*, 607 F. App'x 171, 173-74 (3d Cir. 2015).[20] "With respect to 'aiding and abetting' under 18 U.S.C. § 2, the Government must prove: '(1) that another committed a substantive offense; and (2) the one charged with aiding and abetting knew of the commission of the substantive offense and acted to facilitate it.'" *United States v. Centeno*, 793 F.3d 378, 387

---

[19]     *See, e.g.*, *United States v. Brown*, No. 22-108, 2022 WL 16855129, at *7 (D.N.J. Nov. 10, 2022) (reviewing Rule 29 and 33 arguments based on same issues together and Rule 33 error argument separately).

[20]     *See also* ECF 242, Tr., 29:19-40:19, 41:4-42:6 (conspiracy); 42:6-43:25 (receiving healthcare kickback); 43:25-55:22 (state of mind); 55:23-65:19 (accomplice liability and co-conspirator liability).

(3d Cir. 2015) (quoting *United States v. Mercado*, 610 F.3d 841, 846 (3d Cir. 2010)) (internal quotations omitted).

The conspiracy to violate the Anti-Kickback Statute charge requires the United States to demonstrate beyond a reasonable doubt that "a conspiracy was formed with the purpose of violating the anti-kickback statute, that [Valentino] willfully and knowingly joined the conspiracy and, that one or more of the conspirators performed an overt act in furtherance of the conspiracy." *United States v. Picciotti*, 40 F. Supp. 2d 242, 249 (D.N.J. 1999) (citing *United States v. Uzzolino*, 651 F.2d 207, 214 n.13 (3d Cir. 1981)); *see also United States v. Savino*, 788 F. App'x 869, 872 n.3 (3d Cir. 2019) (citing *United States v. Rigas*, 605 F.3d 194, 206 (3d Cir. 2010)) (further citation omitted); *United States v. Greenspan*, No. 16-114, 2016 WL 4402822, at *11 (D.N.J. Aug. 16, 2016).[21]

B.    **The United States proved Valentino guilty of conspiracy to pay and receive healthcare kickbacks and receiving healthcare kickbacks beyond a reasonable doubt.**

Valentino argues there is insufficient evidence to prove: (1) an agreement to pay and receive healthcare kickbacks which he knowingly and intentionally joined;[22] and (2) he knowingly and willfully received healthcare kickbacks. The Court disagrees on both grounds.

---

[21]    *See supra* n.20 (jury charge).

[22]    Valentino's "kitchen sink" motion is not the picture of clarity, especially as to this argument. In his introductory paragraphs he seems to argue about his membership in the agreement (ECF 230 at 5-6), but later in his brief he cites the model jury instruction for the existence of an agreement in support of his argument. (ECF 230 at 18-20.) His analysis appears to focus on Valentino's membership in the conspiracy. (*Id.*) The Court construes his argument as there was insufficient evidence to prove (1) the existence of an agreement, and (2) Valentino's membership in the agreement. There is sufficient evidence of both for the reasons set forth herein.

Valentino first contends there is insufficient evidence he knowingly and intentionally joined the conspiracy because there is no evidence of "direct communications" between Valentino and Afolabi, Douglas, or Jackson about MedX or the compound pain cream prescriptions. He argues "the government failed to adduce any evidence that Dr. Valentino sought to receive anything in exchange for issuing prescriptions to patients, that he implicitly or explicitly agreed to issue prescriptions in exchange for payment, or that there was an understanding of terms." (ECF 230 at 19.) He next argues there is no evidence he acted with "willful intent" to commit the crime of conspiracy and receiving healthcare kickbacks or that he believed the payments received were intended to be kickbacks. (ECF 230 at 20-21.) He maintains the evidence showed he prescribed the medications for a legitimate medical purpose, and "there is no evidence of any conversation with Dr. Valentino wherein he was aware of or acknowledged an illicit purpose for the payments he received." (ECF 230 at 20-21.)

Valentino essentially argues his conviction cannot stand because there is no "smoking gun" evidence. But no "smoking gun" evidence is required to sustain his conviction.

An explicit, spoken agreement is not required to sustain a conspiracy conviction.[23] *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005); *United States v. Kusi*, No. 20-1095, 2021 WL 5505399, at *2 (3d Cir. Nov. 24, 2021); *see also* ECF 242, Tr., 29:19-40:19, 41:4-42:6. A conspiracy may be entirely proven by indirect and circumstantial evidence and "inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical

---

[23]     "Indeed, common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract. Rather, the illegal agreement can be, and almost always is, an implicit agreement among the parties to the conspiracy." *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007) (further citation omitted).

inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." *Brodie*, 403 F.3d at 134 (internal quotation and further citation omitted); *see also Kusi*, 2021 WL 5505399, at *2. The Court "must give 'close scrutiny' to the sufficiency of the government's evidence in a conspiracy case," and a conspiracy may not be proven "'by piling inference upon inference' where those inferences do not logically support the ultimate finding of guilt." *Brodie*, 403 F.3d at 134 (quoting *United States v. Coleman*, 811 F.2d 804, 808 (3d Cir. 1987). Similarly, an agreement to join the conspiracy may be proven entirely through circumstantial evidence. *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016); *McKee*, 506 F.3d at 241. One can infer an agreement to conspire from a participant's intentional conduct that furthers the aims of the conspiracy so long as he "has knowledge of the conspiracy's illicit purpose when he performs the acts which further that illicit purpose." *McKee*, 506 F.3d at 241 (citing *Direct Sales Co. v. United States*, 319 U.S. 703 (1943) and *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975)); *see also United States v. Trinidad*, No. 19-152-1,6,12, 2023 WL 144435, at *4 (E.D. Pa. Jan. 10, 2023). Mens rea may similarly be proven by circumstantial evidence. *United States v. Bryant*, 655 F.3d 232, 243 (3d Cir. 2011); *McKee*, 506 F.3d at 235 n.9.

Here, the United States presented more than sufficient evidence to prove Valentino knowingly and intentionally joined the conspiracy to pay and receive kickbacks and that he knowingly and willfully received healthcare kickbacks in exchange for his compound pain cream prescriptions beyond a reasonable doubt.

Jackson, Douglas, and Afolabi agreed MedX would pay NewTech a portion of profits for compound pain cream prescriptions NewTech's physicians sent to MedX for fulfillment. Then they worked to reel in Valentino—"the big fish." Afolabi connected with Miller and Valerie

Valentino. Afolabi proposed a direct relationship between MedX and Valentino which centered around him sending MedX compound pain cream prescriptions for fulfillment and receiving payment directly from MedX in exchange. MedX proposed to pay Valentino directly for "promotional services" for the creams. While this direct relationship never panned out, an indirect relationship involving payments for prescriptions did. And it always revolved around MedX paying Valentino for compound pain cream prescriptions.

Valentino, Jackson, Douglas, Miller, and Afolabi consummated their illicit relationship: Valentino sent his patients' compound pain cream prescriptions to MedX for fulfillment, MedX paid NewTech a portion of the profits generated by Valentino's scripts, and within days, NewTech paid Valentino a share of the profits from the prescriptions referred. The conspirators clearly thought using NewTech as a "middle-man" insulated the referral payments from liability. Afolabi, Douglas, and Jackson consistently testified MedX paid NewTech for Valentino's prescriptions, and NewTech, in turn, paid Valentino and Miller for the same. The paper trail confirmed their testimony as did the timing of payments from MedX to NewTech and NewTech to Valentino.

Indeed, the conspiracy needed Valentino and his prescriptions to work. And he was a knowing and willful participant. The unrebutted testimony from Valentino's medical assistant—his own witness—confirmed Valentino, the only doctor in the practice, made the decision about where to send the compound pain creams prescriptions for fulfillment. He chose MedX. Valentino made the decision to start prescribing compound pain creams, wrote the prescriptions for his patients, and directed his office staff to send them to MedX by writing "MedX" on patients' encounter forms and completing the separate MedX-created prescription form when prescribing the creams.

The scheme followed a basic pattern: prescription referred from Valentino and Miller and filled at MedX, payment from MedX to NewTech, and then payment from NewTech to Miller and Valentino. When the prescriptions started, the payments started. When the prescriptions stopped, the payments stopped. (*See* Ex. 202, 261, 207A, 210; ECF 238, N.T., 132:5-8, 133:3-13, 155:2-19.) Valentino knew of the payments from NewTech; Miller consistently sent Valentino spreadsheets showing the money NewTech paid Valentino Spine.[24]

And during the scheme, the payments sent from MedX to NewTech and NewTech to Valentino varied in amount based on the volume of prescriptions referred to MedX from Valentino and the profits generated by each. Indeed, Afolabi sent Jackson spreadsheet breakdowns each month to capture the prescriptions Valentino sent and profits earned on each prescription.

Valentino was aware insurance stopped covering compound pain creams during the scheme. He received and signed a letter sent by MedX permitting MedX to substitute the compound pain creams with commercial, manufactured creams when insurance denied coverage, allowing the scheme to continue, but with less money flowing to Valentino through NewTech. Then even the money for the substituted creams dried up. Eventually Valentino's prescriptions, and the payments to him in return, stopped altogether.

This is not a case built on inference upon inference to get to a conviction. It is a classic conspiracy proved by circumstantial evidence. The jury reasonably inferred a conspiracy "from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." *Brodie*, 403 F.3d at 134. And a

---

[24] Valentino's email address was continuously confirmed by witnesses at trial, including by his medical assistant. (ECF 241, N.T., 72:1-11.)

reasonable jury could (and did) conclude Valentino knowingly and intentionally joined the conspiracy to pay and receive healthcare kickbacks based on all of the evidence presented. He wrote the prescriptions, directed they be sent to MedX, and knew of the payments from NewTech which started and stopped when his prescriptions to MedX started and stopped.

And there is sufficient evidence Valentino acted with the requisite intent to receive healthcare kickbacks. The United States was not required to adduce "smoking gun" evidence of Valentino conversing with his co-conspirators or expressly acknowledging the payments were for an illicit purpose. The testimony and exhibits presented at trial, when viewed as a whole, confirm this reasonable inference (even if Valentino would much have preferred the jury to infer he was acting in good faith). Valentino's insistence that the prescriptions were for a legitimate medical purpose is misplaced. The United States needed to prove *one* purpose of the prescription referral was for receipt of the kickback, not that it was the only purpose. *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985). And the evidence of medical necessity only answers one question: why Valentino prescribed the medication to the patient. It does not answer the second question: why the prescriptions were sent to MedX for fulfillment. While the jury heard evidence that some patients liked and used the creams, the overwhelming evidence was sufficient for a reasonable jury to conclude Valentino sent the prescriptions to MedX to receive the kickbacks.

Finally, the jury reasonably rejected Valentino's defense he acted within the personal services safe harbor of the Anti-Kickback Statute.[25] Valentino never produced an executed agreement between NewTech and himself, and the United States produced substantial evidence the payments from NewTech to Valentino Spine were based on the volume and value of

---

[25]     42 U.S.C. § 1320a-7b(b)(3)(E); 42 C.F.R. § 1001.952(d)(1).

prescriptions Valentino referred to MedX. Valentino failed to prove two of the six prongs he needed to meet his burden. A reasonable jury rejected this defense.

The Court denies Valentino's motion under Rule 29 because, after reviewing all of the evidence in the light most favorable to the United States, there is substantial evidence to uphold the jury's decision; the jury's verdict more than passes the "bare rationality" test. It also denies Valentino's motion under Rule 33 because the evidence presented at trial is more than sufficient for a reasonable jury to conclude Valentino knowingly and intentionally joined the conspiracy to pay and receive healthcare kickbacks and knowingly and willfully received healthcare kickbacks in exchange for prescriptions beyond a reasonable doubt; there is no risk of a miscarriage of justice and the jury did not convict an innocent person.

### C.   Valentino is not entitled to a new trial under Rule 33 based on perceived errors.

Valentino next argues the Court erred by: (1) not providing his requested jury instruction for the Anti-Kickback Statute's personal services safe harbor; (2) admitting co-conspirator statements because they are hearsay and do not fall within Federal Rule of Evidence 801(d)(2)(E); (3) excluding his expert testimony as irrelevant; (4) denying his motion to preclude emails that pre-dated the conspiracy; (5) denying his motion for severance; (6) denying his motion to exclude "evidence of the flow of money from NewTech to Valentino Spine in excess of $113,000"; and (7) giving the jury instructions on accomplice liability and willful blindness. Valentino argues the Court must grant a new trial in the interest of justice because these errors, individually and collectively, substantially influenced the jury's verdict. Valentino already raised, and the Court addressed in numerous pretrial orders, all the arguments he raises here except for his jury instruction objections, which the Court already overruled during the charging conference.

Nothing in Valentino's motion for a new trial based on alleged errors (individually or collectively) changes the Court's rulings before and during trial, and the Court denies it.

### 1. The Court did not err in refusing to provide Valentino's proposed safe harbor instruction.

The Court instructed the jury Valentino bore the burden of proving the personal services safe harbor of the Anti-Kickback Statute by a preponderance of the evidence. Valentino argues the Court erred in failing to give his proposed safe harbor instruction in accordance with *Ruan v. United States*, 142 S.Ct. 2370 (2022), which would have shifted the burden of proof to the United States. This is the fifth time Valentino briefs this issue.[26] The Court also heard oral argument on this issue before trial.[27] In rejecting Valentino's argument before trial, the Court concluded the Anti-Kickback Statute's personal services safe harbor did not warrant the same treatment as the "except as authorized" clause in Section 841 of the Controlled Substances Act examined by the Supreme Court in *Ruan*. (ECF 199.) As such, the Court held the personal services safe harbor is an affirmative defense which Valentino bore the burden of proving by a preponderance of the evidence. (ECF 199.) The Court instructed the jury consistent with its ruling. (ECF 242, Tr., 67:20-69:8.)

Valentino now again argues the Court's instruction was in error because it placed the burden of proof on him rather than requiring the United States prove he "knowingly and willfully accepted payments that he knew violated the Personal Services Safe Harbor" beyond a reasonable doubt. (ECF 230 at 7.) But nothing in Valentino's post-trial motion or reply in support of his

---

[26]    ECF 151 at 7-13; ECF 159; ECF 160; ECF 191; ECF 230; ECF 249 (reply in support of the instant motion).

[27]    ECF 180 (oral argument transcript of pretrial motion *in limine*).

motion changes the Court's pretrial analysis and conclusion which considered Valentino's *Ruan* argument. (ECF 199.) The Court disagrees it erred in instructing the jury Valentino bore the burden of proving the safe harbor by a preponderance of the evidence. The Court appropriately instructed the jury and denies Valentino's motion for a new trial on this ground.

### 2. The Court did not err in admitting the co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).

Valentino argues the Court erred in admitting co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) because the United States cannot establish by a preponderance of the evidence Valentino was a member of the conspiracy. Before trial, Valentino moved to preclude hearsay statements arguing the United States could not prove he joined the conspiracy by a preponderance of the evidence and thus, Rule 801(d)(2)(E) did not apply. (ECF 132.) The Court denied his motion without prejudice. (ECF 186.) Valentino raised the argument again after the close of the United States' case and does so again here. He argues: "The record contains not a scintilla of evidence that Dr. Valentino had any communications, oral or written, with any of the Cooperating Witnesses in which the government alleges Dr. Valentino agreed to enter into the alleged conspiracy. To the contrary, every single Cooperating Witness testified that they did not speak to, meet with, correspond about, or telephonically communicate with Dr. Valentino concerning MedX pharmacy." (ECF 230 at 17-18.). Valentino's argument misses the mark. The Court denies his motion because the United States met its burden, and the Court properly admitted co-conspirator statements under Rule 801(d)(2)(E).

"Under the Federal Rules of Evidence, a statement is not treated as hearsay if it is 'offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy.'" *United States v. Onyenso*, 615 F. App'x 734, 736-37 (3d Cir. 2015) (quoting

Fed. R. Evid. 801(d)(2)(E)). "In order for a statement to be properly admitted as a co-conspirator statement, 'the Government must prove by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy.'" *Id.* (quoting *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013)). "To prove these elements, the Government may rely on the co-conspirator's statements themselves, if they are corroborated by independent evidence." *Turner*, 718 F.3d at 232 (first citing *Bourjaily v. United States*, 483 U.S. 171, 181 (1987); and then *United States v. Gambino*, 926 F.2d 1355, 1361 (3d Cir. 1991)). As discussed above, a conspiracy, and one's membership in it, may be proven by circumstantial evidence. Finally, "[t]he court may conditionally admit evidence under Rule 801(d)(2)(E), provided the government makes the necessary showing *by the close of its case*." *Onyenso*, 615 F. App'x at 737 (citing *United States v. Ammar*, 714 F.2d 238, 246–47 (3d Cir. 1983)) (emphasis in original).

The United States proved a conspiracy existed by (at least) a preponderance of the evidence by the close of its case for the reasons previously set forth above and presented sufficient evidence to corroborate the co-conspirator's statements to meet its burden.[28]

Again, each cooperating witness testified about the nature and purpose of the conspiracy and Valentino's role in it. They all consistently testified MedX paid NewTech a portion of profits generated from Valentino's scripts, and NewTech then paid a portion of the profits to Valentino. All documentary evidence introduced at trial confirmed this.

---

[28]   Medical assistant, Diana Waer, testified after the United States rested. The United States met its burden of proof to admit the co-conspirator statements without her testimony.

While Jackson admitted to being the mastermind behind it all, the conspiracy needed Valentino. Valentino's relationship with MedX always revolved around being paid for compound pain cream prescriptions. MedX and Valentino never consummated a direct relationship, but that did not stop them from achieving their goal. Valentino wrote the pain cream prescriptions on MedX forms (different from his other prescriptions) which his staff then sent to MedX. He had sole authority to write the prescriptions as the only medical provider, and he directed where they be sent. At the same time as he began writing prescriptions for fulfillment at MedX, he began getting payments from NewTech. This was no coincidence. When he stopped writing prescriptions to be filled at MedX, the NewTech payments stopped. The checks and bank records (and the summaries of the same) in evidence show MedX paid NewTech and, within days, NewTech wrote checks to Valentino. Valentino knew of the money NewTech paid Valentino Spine—his medical practice— as Miller consistently sent him spreadsheets including this information. The Court properly conditionally admitted the co-conspirator statements because the United States proved by at least a preponderance of the evidence Valentino was a member of the conspiracy by the close of its case.

### 3. The Court did not exclude Valentino's experts; Valentino chose not to call his experts. The Court did not err in limiting the scope of the expert testimony.

Valentino maintains the Court prevented him from presenting a defense by precluding his ability to introduce expert testimony. (ECF 230 at 21-22.) To be clear, the Court did not exclude Valentino's experts. (ECF 190.) The United States moved to preclude Valentino's experts' testimony before trial. (*Id.*). Valentino argued, and the Court agreed, the admissibility of some of the expert testimony depended on the United States' case-in-chief at trial. (*Id.*). The Court granted the United States' motion in part to limit the experts' testimony but still permitted Valentino to

call them *both* at trial. And the Court noted either party could revisit its ruling at trial. (*Id.* at 4-5 ("The Court addresses each category of evidence in turn, but notes Valentino (or the United States) may reraise these issues should the United States open (or not open) the door at trial.")). Valentino ultimately chose not to all his experts, even after the Court inquired about them during trial, and he did not ask the Court to revisit its ruling. (ECF 237, Tr., 111:2-5.)

With this backdrop, the Court did not err in limiting Valentino's expert testimony at trial. Valentino's proposed experts sought to testify to five broad areas: (1) chronic pain and the opioid crisis; (2) the proposed expert's use of compound pain cream in his practice; (3) the general effectiveness or medical necessity of compound pain creams; (4) general information about compound pain creams, how they are dispensed and prescribed, and general information about compound/mail-order pharmacies; and (5) the expert's disagreements with the investigating agent's affidavits. (ECF 190.). The Court only permitted expert testimony about "what compound pain creams are, how they are prescribed and dispensed, the use of e-scribing to prescribe, the need to send such prescriptions to 'specialty' compounding pharmacies as opposed to a local pharmacy like CVS which may require prescriptions to be mailed, and *very briefly* the need for physicians to prescribe medication to an 'in-network' pharmacy." (*Id.* at 5) (emphasis in original.) The Court properly limited the experts' testimony.

The Court properly precluded testimony about chronic pain and the opioid crisis affecting millions of Americans because it was irrelevant to the case, would inflame the jurors' passions in discussing the opioid crisis, risked confusing the issues to the jury, and would create a side trial about issues immaterial to the case. (*Id.*). It also properly precluded testimony about one proposed expert's use of compound pain cream in his own medical practice. Whether the expert prescribed pain cream was irrelevant to the case against Valentino. It also risked confusing the issues to the

jury and creating a side trial about whether physicians should prescribe and/or use compound pain creams.

The Court also properly precluded testimony about the medical necessity of compound pain creams. *See Greenspan,* 923 F.3d at 151-52. The Court found the expert testimony on medical necessity irrelevant. (ECF 190 at 5.) But even if it was relevant to refute mens rea, as the defendant in *Greenspan* argued and Valentino argues here, this testimony had minimal probative value which was substantially outweighed by the risk of misleading or confusing the jury. *Greenspan,* 923 F.3d at 151-52.

Assuming the compound pain creams were medically necessary, their medical necessity only explains why Valentino prescribed the cream for the patient but not why the scripts were sent to MedX to fill. *Greenspan,* 923 F.3d at 151. Importantly, the United States only had to prove one purpose—not the only purpose—of the referral to MedX was to receive the kickback. *Greber*, 760 F.2d at 72. The United States argued, and introduced testimony, Valentino directed the compound pain cream prescriptions be sent to MedX even though the patients had different pharmacies to fill other medications. The Court *permitted* relevant expert testimony about why the compound pain cream scripts would need to be sent to a compound and/or mail-order pharmacy such as MedX; Valentino chose not to adduce it. (ECF 190.)

In any event, Valentino elicited ample testimony from his patients and former patients, who the United States called in their case-in-chief, that the compound pain cream helped their pain for at least a portion of the time. Thus, evidence of the cream's medical necessity was in fact provided to the jury, just not through expert testimony. Valentino, not the Court, declined to introduce expert testimony about why Valentino directed the scripts be sent to MedX rather than the patients' other pharmacies.

The Court finally properly precluded testimony about the expert's disagreement with the agent's affidavits. The affidavits were not introduced at trial, and the Court permitted the expert to refute the agent's testimony, if needed, subject to specific objections at trial. Valentino chose not to call the expert to refute the agent's trial testimony. The Court did not exclude Valentino's experts nor did it err in limiting the proposed expert testimony.

### 4. The Court did not err in admitting emails which predated the conspiracy for a limited purpose.

Valentino argues the Court erred in denying his motion to preclude emails predating the conspiracy. (ECF 230 at 22.) Before trial, Valentino moved to preclude the admission of emails predating the conspiracy as irrelevant, under Federal Rule of Evidence 403, and violative of the spousal communication privilege. (ECF 187.) After oral argument and extensive briefing, the Court permitted the introduction of twelve emails predating the conspiracy for the limited purpose of "show[ing] the background and context of how the alleged conspirators' relationship formed, the relationship was based upon Dr. Valentino providing prescriptions for compound pain cream, and to demonstrate Defendants tried to conceal the true nature of the payments" under Federal Rule of Evidence 404(b). (ECF 187.) At trial, the Court provided a limiting instruction when the United States introduced the emails and did so again in the final jury charge. (ECF 206, Tr., 229:16-25; ECF 242, Tr., 27:10-18); *see also Glenn v. Wynder*, 743 F.3d 402, 407-408 (3d Cir. 2014) (holding the Court assumes the jury follows all instructions). The Court properly admitted the evidence under Rule 404(b) for the reasons set forth in its previous Order and incorporates those reasons here. (ECF 187.) The Court addresses one new argument raised here: the emails are hearsay.

Valentino never previously objected to the admission of these emails as hearsay. His pretrial motion *in limine* did not include hearsay as a basis to preclude them. (ECF 137.) And he did not object to the emails as hearsay when the United States moved to admit them at trial. To be clear, Valentino only explicitly discusses Exhibit 953 in his instant motion but argues the Court erred in admitting all emails predating the conspiracy without referencing their trial exhibit numbers. Upon the Court's careful review of the record, Exhibits 947, 947A, 951, 1001, 1001A, 991, 988, 988A, 952, and 953 are the emails Valentino moved to preclude before trial. Valentino had "no objection" at trial to the admission of any of these emails which predated the conspiracy. (ECF 206, Tr., 236:25-237:10, 240:1-22, 245:9-247:15, 252:4-19, 253:12-254:14; ECF 235, Tr., 32:1-23; ECF 238, Tr., 160:20-161:16).

In any event, even if Valentino had objected based on hearsay at trial, the emails are not hearsay at all because the United States did not offer them as evidence for the truth of the matters asserted therein. Fed. R. Evid. 801(c); 802. The United States offered the emails for the limited purpose of showing the background and context of the co-conspirators relationship before the conspiracy formed. Take Exhibits 951 and 953 as examples. In Exhibit 951, Afolabi and Valerie Valentino discuss how many compound pain creams Valentino would prescribe per week and whether New Jersey or Pennsylvania restricted his ability to prescribe compound pain creams to MedX for delivery. Ex. 951. Whether New Jersey or Pennsylvania actually had restrictions, the number of prescriptions Valentino planned to send, or whether Afolabi was, in fact, waiting for additional information to add to the unconsummated contract does not matter. This email exchange is relevant to show the start of the relationship between MedX and Valentino centered around Valentino prescribing compound pain creams and MedX paying Valentino money for prescriptions. And that is established not by accepting what the emails say as true, but the fact that

36

conversations about the prescriptions and payments occurred between Afolabi and Valerie Valentino at all. This is a proper, non-hearsay purpose. *Onyenso*, 615 F. App'x at 736.

In Exhibit 953, Miller writes to Valentino and Valerie Valentino that MedX started paying Valentino "commission" without signing the contract, and there was $620.00 "due" to Valentino but Stark regulations prohibited the payments going directly to him. Ex. 953. It does not matter that MedX tried to pay Valentino commission in April 2013 pursuant to an unconsummated contract, that MedX "owed" Valentino $620.00, or that Stark regulations prohibited MedX from paying Valentino directly. The United States offered the emails in Exhibit 953 for the non-hearsay purpose of showing how the conspirators' relationship formed and how their relationship always centered around payment for compound pain cream prescriptions, not to prove MedX actually paid Valentino before the conspiracy, MedX actually owed Valentino $620.00, or that Stark regulations actually prohibited the payments from MedX.

The same is true for the other exhibits referenced here. The Court properly admitted the evidence under Rule 404(b), Valentino never properly raised a hearsay objection before or during trial, and even if he did, the emails are not hearsay because they were not offered for the truth of the matter contained therein.[29]

### 5. The Court did not err in denying Valentino's motion for severance before and during trial or in admitting certain emails without severing the trial.

Valentino contends the Court erred in denying his motion for severance before and during trial. (ECF 230 at 24.) The gravamen of his argument centers around the three cooperating witnesses' testimony and statements and their recitation of Miller's statements. He argues this

---

[29]   The Court similarly rejects Valentino's recurring argument that he did not respond to emails sent to an email address which multiple witnesses confirmed was in fact his email address.

testimony was inadmissible hearsay and substantially prejudiced him. But the Court already found these statements admissible against Valentino under Federal Rule of Evidence 801(d)(2)(E). His motion in this respect is therefore denied.

He also argues the Court admitted various emails in error during trial "over his objection" which were "substantially prejudicial" to him and warranted severance. His first argument centers around the emails predating the conspiracy. The Court addressed his argument at length in pretrial motions and again in this Memorandum. The Court properly admitted the emails, and their admission did not, and does not, change the Court's decision regarding severance.[30]

He next argues the Court erred in admitting a March 2015 email chain between Michelle Miller and Valerie Valentino. But Valentino never objected to its admission at trial as unfairly prejudicial. (ECF 238, N.T., 165:16-166:22.) Indeed, the Court admitted the email chain after Valentino noted "no objection" to its admission.[31] He now complains the Court erred in admitting it. But even if he objected on Rule 403 grounds, the Court disagrees the admission of the email chain was "overly prejudicial" and warranted exclusion or severance. Miller, a co-conspirator, wrote this email during the conspiracy indicating NewTech money paid to Valentino Spine was split with Miller (and Diana and the staff) via a bonus Valentino Spine paid to Miller. The email

---

[30]     Valentino argues the "prejudice" from admitting these emails "is evident" because the jury reviewed Exhibit 953 during deliberations, an April 2013 email chain where Miller forwarded a message to Valentino and his wife and discussed MedX's payments to Valentino under the unconsummated distribution agreement. Valentino is a recipient on the email chain. Even if the email is "prejudicial" to Valentino, the Court is hard-pressed to see how the admission of this email warranted severance since Valentino received it.

[31]     Valentino made, and the Court accepted, Valentino's continuing hearsay objection for co-conspirator statements made during the course of the conspiracy only.

chain was thus admissible against Valentino as a co-conspirator, and even if it had slight prejudice, the probative value is high and weighs in favor of admission.[32]

He also argues the Court erred in admitting emails from February 23 and 28, 2018 between Miller and Valentino (Ex. 910) and Miller, Valentino, and Valerie Valentino (Ex. 932). He argues the emails are outside the conspiracy by six months and Valentino never responded to the emails.

As to Exhibit 910, Valentino raised a foundation objection at trial which the Court overruled. The agent laid the foundation for admission of the email. (ECF 238, N.T., 166:23-167:15.) Valentino now raises a new argument about the email: it post-dates the conspiracy and Valentino did not respond to it.

The Court is unpersuaded by Valentino's continued argument there is no evidence he knew of emails sent to his email address because he did not respond to them in writing. Numerous witnesses, including the investigating agent and Valentino's medical assistant, confirmed the email address in question belonged to Valentino. His medical assistant testified she used it to communicate with Valentino. It is reasonable to infer Valentino received, and read, the emails sent to his known email address even if he did not respond. The Court is also unpersuaded the email should have been excluded because it post-dates the conspiracy because it discusses the MedX money paid to Valentino through NewTech during the conspiracy. The Court properly admitted the email, and its admission did not warrant severance.

As for Exhibit 932, Valentino objected to the email as irrelevant at trial because it post-dated the conspiracy. (ECF 238, N.T., 169:1-15.) The Court overruled the objection finding the

---

[32]     Moreover, Valerie Valentino's email in the middle of the chain was not admitted for the truth of the matter asserted, but rather for the effect on the listener as Miller, a co-conspirator, responded to it.

email post-dated the conspiracy but discussed the "MedX" money paid through NewTech during the conspiracy. Valentino requested the Court give a limiting instruction to the jury about Valentino not answering the email which the Court provided. Even though Valentino did not respond to the email, it was sent to his known email address which various witnesses confirmed to be his. The Court properly admitted the email as relevant, and its admission did not warrant severance as he was a recipient.

### 6. The Court did not err in admitting evidence of the flow of money between NewTech and Valentino Spine in excess of $113,000.

Valentino argues the Court erred in denying his motion to preclude spreadsheets containing the full amount of money that flowed from NewTech to Valentino Spine. (ECF 230 at 12-13.) The Court admitted this evidence as "other acts" evidence under Federal Rule of Evidence 404(b) for the limited purposes of providing background and context of the relationship between NewTech and Valentino Spine and proving Valentino acted with the requisite mens rea. (ECF 188.) The Court provided a limiting instruction to the jury which the Court assumes the jury follows. (ECF 239, N.T., 94:1-16; ECF 242, Tr., 27:19-28:9); *see also Glenn*, 743 F.3d at 407-408. The evidence was highly probative of contested issues in the case, and its probative value was far from substantially outweighed by the risk of unfair prejudice, especially considering the limiting instruction provided. The Court denies Valentino's motion for the same reason previously set forth in its pretrial Order. (ECF 188.)

### 7. The Court did not err in giving the accomplice liability and willful blindness instructions.

Valentino lastly argues he objected "to several of the Court's proposed jury instructions, including but not limited to the Accomplice Liability and Willful Blindness instructions" which he "submits . . . were in error, and . . . resulted in prejudice . . . [and] an unsupported and unjust

verdict." (ECF 230 at 29.) Valentino offers no argument as to why the Court erred in providing these instructions. (*Id.*). The Court will not surmise or assume what Valentino means to argue when he says the Court's instructions "were in error." Instead, the Court turns to the arguments he raised on the record at trial which the Court already rejected.

Valentino objected to the accomplice liability instruction arguing he was not charged with aiding and abetting in the Indictment. (ECF 219 at 4; ECF 240, Tr., 21:6-22:25.) The Court, and the United States, directed counsel and Valentino to the Indictment which charged him under 18 U.S.C. § 2 for the substantive counts of receiving healthcare kickbacks. The Court properly gave the instruction.

Valentino also objected to the willful blindness instruction arguing the evidence did not support giving it to the jury. (ECF 219; ECF 240, N.T., 30:16-32:17.) The Court disagreed then and disagrees now. The Court instructed the jury the United States could prove the "knowledge" requirement by proving actual knowledge or willful blindness, "which is 'a subjective statement of mind that is deemed to satisfy the scienter requirement of knowledge.'" *Caraballo-Rodriguez*, 726 F.3d at 420 n.2 (citing *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000)). "The willful blindness instruction is justified as long as there was sufficient evidence that a defendant 'deliberately avoided learning the true facts' or 'closed his eyes to what would otherwise have been obvious to him.'" *United States v. Onque*, 169 F. Supp. 3d 555, 570 (D.N.J. 2015), *aff'd*, 665 F. App'x 189 (3d Cir. 2016) (quoting *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999)) (further citations omitted).

Valentino does not object to the phrasing of the instruction, only that there was insufficient evidence to provide the instruction.

Valentino again looks for "smoking gun," direct evidence, but this is not required. *United States v. Stadtmauer*, 620 F.3d 238, 259 (3d Cir. 2010). There is sufficient evidence to warrant the willful blindness instruction, including Valentino: (1) did not speak to Afolabi, Douglas, or Jackson about the payments from NewTech or MedX; (2) did not respond to emails about or otherwise referencing the scheme; (3) knew he began receiving money from NewTech in 2013, the same time he started prescribing to MedX; (4) knew insurance stopped covering compound pain creams around 2015, leading him to approve substitute medications for MedX to fill for his patients, and at the same time, the money NewTech paid him started decreasing; and (5) knew he stopped prescribing to MedX in 2017, the same time NewTech stopped paying him. This evidence is sufficient to infer Valentino "deliberately avoided learning the true facts." The United States presented ample evidence warranting a willful blindness instruction.[33]

### 8. Valentino fails to make his cumulative error argument. The Court declines to make it for him.

Finally, Valentino argues the Court's perceived errors noted above collectively warrant a new trial under Rule 33. The Court does not agree that it erred. But even if it did, Valentino makes no substantive argument why the errors, taken together, warrant reversal and thus, wholly fails to meet his burden. *MacInnes*, 23 F. Supp. 3d at 541 (explaining the defendant bears burden of proving a new trial is warranted under Rule 33).

The Third Circuit is clear, even if there are errors at trial, the Court does not "simply count[] up the number of errors discovered" to order a new trial. *Greenspan*, 923 F.3d at 154. Rather, there

---

[33] Even if the Court provided the willful blindness instruction in error, the error was harmless because the instruction was legally correct, and the United States presented sufficient evidence to prove Valentino's actual knowledge at trial. *Stadtmauer*, 620 F.3d at 260 n.26 (noting any error in providing the willful blindness instruction was harmless because the instruction was legally correct and there was sufficient evidence of actual knowledge presented at trial).

are two ways for errors which are not individually reversible to cumulatively warrant reversal. *Id.* "*[R]elated* errors can have an inherent synergistic effect, in which they amplify each other in relation to a key contested issue in the case" and "even if no synergy, accumulating, *unrelated* errors can still warrant reversal if their probabilistic sum sufficiently undermines confidence in the outcome of the trial." *Id.* (internal quotations and further citation omitted) (emphasis in original). Cumulative errors do not warrant reversal when the remaining evidence of guilt is overwhelming. *Id.* (further citation omitted).

Here, Valentino makes no attempt to identify the synergistic effect of any related errors nor does he attempt to argue any unrelated errors have a "probabilistic sum [which] sufficiently undermines the confidence in the outcome of the trial." *Id.* In fact, he does not even address whether the errors are related or unrelated in any respect. Throughout his brief, he summarily argues the errors, individually and collectively, warrant a new trial. This is insufficient to meet his burden. *Id.* at 155 (quoting *Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013) ("But as then-Judge Gorsuch explained, a 'perfunctory assertion falls well short of what's needed to overturn a judgment.'")). In light of the Court's finding it did not err, it declines to analyze Valentino's perfunctory cumulative error argument.

## IV.   CONCLUSION

The Court denies Valentino's motion for judgment of acquittal or for a new trial.

An Order consistent with this Memorandum will be docketed separately.